**KOHLER CO., Plaintiff/Appellant,**

v.

**MOEN INCORPORATED, f/k/a Stanadyne, Inc., Defendant/Appellee.**

No. 92–2350.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1992.

Decided Dec. 14, 1993.

Robert L. Titley (argued), Laurence C. Hammond, Jr., Allan W. Leiser, Quarles &

Brady, Milwaukee, WI, Lloyd L. Zickert, Adam H. Masia, Chicago, IL, John P. Fredrickson, Nilles & Nilles, Milwaukee, WI, for plaintiff-appellant.

Daniel C. McEachran (argued), Kinzer, Plyer, Dorn, McEachran & Jambor, Chicago, IL, for defendant-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

This action began in 1987 when Moen, Incorporated ("Moen") filed two applications in the United States Patent and Trademark Office ("PTO") to register a faucet design and a faucet handle design as trademarks. Kohler Company ("Kohler") opposed the applications before the PTO's Trademark Trial and Appeal Board ("TTAB") on the ground that product shapes were not registrable as trademarks. The TTAB dismissed Kohler's oppositions. Kohler sought review of the TTAB's decision under 15 U.S.C. § 1071(b) in the district court. The parties filed cross summary judgment motions and stipulated first that they would rely on the record before the TTAB and further that no new evidence would be submitted. The district court entered summary judgment in favor of Moen and against Kohler. Kohler filed a timely appeal from the district court's judgment. We affirm.

## I. BACKGROUND

Kohler and Moen are competitors in the business of manufacturing and selling plumbing products, including faucets and faucet handles. Moen sought and obtained trademark registration of its "LEGEND" kitchen faucet and the appearance of the handle used on the "LEGEND" and other Moen faucets. In support of registration of its product configurations as trademarks, Moen introduced voluminous evidence of sales and promotional expenses with respect to each design, and also submitted substantial evidence that purchasers of its products recognized the source of the faucets by their distinctive shapes. The record included hundreds of declarations from persons in the plumbing business and from individual purchasers attesting to the distinctiveness of the shape of Moen's faucet and handle without reference to any markings. One of Moen's vice-presidents submitted a declaration stating that Moen's faucet design is not based upon utility or function, is not inexpensive to manufacture, and is only one of many competitive designs in the industry performing the same function. Moen also submitted a declaration from the chairman of one of its chief competitors, Price Pfister, that stated that Moen's faucet is distinctive, its design indicates a single point of origin, the design is neither functional nor utilitarian, and that trademark protection for the configuration would not hinder competition in the plumbing trade. Finally, a market research survey of 273 licensed plumbers in six cities revealed that eighty-two percent of those surveyed identified the faucet as a Moen product, and eighty-three percent identified the handle as a Moen product.

In proceedings before the TTAB, in the district court, and in this court, Kohler has forthrightly conceded that if product shapes can receive protection under federal trademark law, Moen is entitled to registration of its LEGEND faucet and faucet handle. Thus, the issue before the district court and this court is legal in nature: does the § 45 definition of "Trademark" in the Lanham Act, 15 U.S.C. § 1127 (1988),[1] ("the Act") exclude trademark protection of product configurations?

## II. STANDARD OF REVIEW

We review issues decided on summary judgment de novo and resolve all reasonable inferences in favor of the nonmoving party. *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

1. The Lanham Act, or Trademark Act of 1946, is the federal trademark statute. *See* 15 U.S.C. §§ 1051–1127 (1988). Congress extensively revised the Lanham Act in the Trademark Law Revision Act of 1988. *See* Trademark Law Revision Act of 1988, Pub.L. No. 100–667, tit. I, 102 Stat. 3935, 3935. The revisions did not take effect until November 16, 1989, one year after their enactment.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c), *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The parties agree there are no issues of material fact that would preclude entry of summary judgment. The central issue on appeal is whether the district court correctly determined that product configurations are entitled to trademark protection under § 43 of the Act, 15 U.S.C. § 1125 (1988).

■ Under the *Chevron* doctrine, established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), "when a court reviews an [administrative] agency's construction of the statute which it administers, it is confronted with two questions." *Id.* at 842, 104 S.Ct. at 2781. First, the court must determine whether Congress addressed the precise question at issue in the statute's plain language. If so, "that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. If, however, the statute is silent or ambiguous with respect to the specific issue, the reviewing court must inquire whether Congress authorized the agency to make the legal interpretation at issue. *Id.* at 843–44, 104 S.Ct. at 2782; *Condo v. Sysco Corp.*, 1 F.3d 599, 603 (7th Cir.1993); *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408, 411–12 (7th Cir.1987). If Congress did not intend such delegation, "the reviewing court must interpret the statute with little deference to the agency's interpretation, for the judiciary is the final authority on issues of statutory construction." *Condo*, 1 F.3d at 604 (citing *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9). If, however, Congress delegated to the agency the authority to interpret the statute, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. To uphold the agency's interpretation, the court does not have to conclude the agency's interpretation was the only possible construction or the construction the court would have reached on its own reading of the statute. *Id.* n. 11. The agency's interpretation need only be reasonable.[2] *Id.* at 866, 104 S.Ct. at 2793; *see also Pauly v. Bethenergy Mines, Inc.*, —— U.S. ——, ——, 111 S.Ct. 2524, 2535, 115 L.Ed.2d 604 (1991) (applying "reasonableness" standard).[3]

2. The dissent misconstrues our deference to the reasonable interpretation of the agency charged with the administration of the Lanham Act under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), with an abandonment of our obligation to review the constitutional challenges raised by Kohler. It is a basic canon of statutory interpretation that a court should not defer to an agency's interpretation of a statute that raises serious constitutional concerns if "there is another interpretation, not raising these serious constitutional concerns, that may be fairly ascribed to [the statute]." *Edward J. De Bartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 577, 108 S.Ct. 1392, 1398, 99 L.Ed.2d 645 (1988). Of course, we defer to an agency's statutory interpretation but only after we have determined in the first instance that the agency's interpretation does not raise serious constitutional concerns. As our independent analysis reveals, the agency's determination that federal trademark protection is available for product configurations fails to raise such concerns.

That the Patent and Trademark Office did not initially allow registration of overall product configurations as trademarks does not preclude us from deferring to the agency's interpretation of that statute, which has been consistent for the last twenty years. While the Supreme Court has noted that "[a]s a general matter ... the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views," *Pauly v. Bethenergy Mines, Inc.*, —— U.S. ——, ——, 111 S.Ct. 2524, 2535, 115 L.Ed.2d 604 (1991), the Court also has emphasized that "[a]n initial agency interpretation is not ... carved in stone." *Chevron*, 467 U.S. at 863, 104 S.Ct. at 2792. An agency is obliged to insure that its interpretation is reasonable by referring to "varying interpretations and the wisdom of its policy on a continuing basis." *Id.* at 863–64, 104 S.Ct. at 2792. The Patent and Trademark Office has fulfilled its obligation to ensure that its interpretation of § 43 is reasonable, and its determination that product configurations may be protected under the Lanham Act is entitled to some deference.

3. While the agency action in *Chevron* involved a legislative regulation, the *Chevron* standards of deference are applied to most agency actions, including administrative adjudications such as those by the TTAB. *See* K. Davis, *Administrative Law Treatise*, § 29:16–7 (1992 Supp.); *see also EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 260, 111 S.Ct. 1227, 1236, 113 L.Ed.2d 274 (1991) (Scalia, J., concurring) ("In an era when our treatment of agency positions is governed by

## III. ANALYSIS

■ In dismissing Kohler's oppositions, the TTAB necessarily concluded that § 45 of the Act provides trademark protection for product configurations. Section 45 of the Act defines trademark to *"include*[ ] any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127 (1988). As Kohler notes, § 45 does not list "product configuration" among its examples of trademarks. Early decisions under the Act strictly construed the language of § 45 and held that a product or container shape was not entitled to trademark protection. *See* 1 McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 7.31 (3d ed.1992) [hereinafter *McCarthy on Trademarks*]; *Ex Parte Minnesota Mining & Mfg. Co.,* 92 U.S.P.Q. 74 (1952). Subsequent TTAB decisions and the courts reviewing TTAB rulings, however, have interpreted § 45 to allow trademark protection for product configurations.

■ In *Application of Kotzin,* 276 F.2d 411, 414–15 (C.C.P.A.1960), the Court of Customs and Patent Appeals[4] ("C.C.P.A.") held that the § 45 list ("word, name, symbol or device") did not restrict other items from receiving trademark protection if they satisfied the requirements for registration on the Principal Register.[5] The court in *Kotzin* supported its interpretation of the statute by noting that the provision stated that trademarks *"include"* words, names, symbols or devices, not that "trademark" *"means"* words, names, symbols or devices. Furthermore, the court noted that the language of § 2 of the Act, 15 U.S.C. § 1052, which lists exceptions to registrability under the Act, supported its ruling that Congress did not intend § 45 to be an all-inclusive list. *Id.* at 414. Section 2 states that "[n]o trademark ... shall be refused registration on the principal register *on account of its nature,"* unless one or more of the specified exceptions to registrability set forth in the statute apply. 15 U.S.C. § 1052 (emphasis added). Neither trouser tags (the item the applicant sought to register in *Kotzin* ) nor product configurations fall within any of the exceptions to registrability set forth in § 2.

In *Application of Mogen David,* 328 F.2d 925 (C.C.P.A.1964), the C.C.P.A. held that the configuration of a container could be registered as a trademark for the product it contains. *Id.* at 929–30. The C.C.P.A. thereafter held that a product configuration itself could be registered as a trademark in *Application of Honeywell, Inc.,* 497 F.2d 1344 (C.C.P.A.), *cert. denied,* 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974). The C.C.P.A., the Federal Circuit, and the TTAB have since interpreted § 45 to allow trademark protection for qualifying product configurations. *See In re Teledyne,* 696 F.2d 968 (Fed.Cir.1982); *In re Morton–Norwich Prods., Inc.,* 671 F.2d 1332 (C.C.P.A.1982); *Oxford Pendaflex Corp. v. Rolodex Corp.,* 204 U.S.P.Q. 249 (TTAB 1973); *In re Superba Cravats, Inc.,* 145 U.S.P.Q. 354 (TTAB 1965). Because Congress did not specify in § 45 that product configurations are entitled to

*Chevron,* the 'legislative rules vs. other action' dichotomy ... is an anachronism."); *Chemical Mfrs. Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 125–26, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985) (applying *Chevron* to Environmental Protection Agency's case-by-case variance determinations as well as 'its regulations); *Eastman Kodak Co. v. Bell & Howell Document Mgt. Prods. Co.,* 994 F.2d 1569, 1571–72 (Fed. Cir.1993) (applying *Chevron* to TTAB adjudication); *Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1327 (7th Cir.1990) (applying *Chevron* to Environmental Protection Agency administrative order). .

4. The Federal Courts Improvement Act of 1982, Pub.L. No. 97–164 § 127(a), 96 Stat. 25, 38, created a new Court of Appeals for the Federal

Circuit by merging the Court of Claims and the Court of Customs and Patent Appeals. The Federal Circuit now has exclusive jurisdiction of TTAB decisions as provided in 15 U.S.C. § 1071. *See* 28 U.S.C. § 1295(a)(4)(B). In *South Corp v. United States,* 690 F.2d 1368 (Fed.Cir.1982), the Federal Circuit adopted as precedent the decisions of the Court of Claims and the Court of Customs and Patent Appeals.

5. Registration on the Principal Register requires proof that the mark is either (1) arbitrary or inherently distinctive, or (2) has become distinctive through the acquisition of secondary meaning, i.e. consumers associate the shape with a single source. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ———, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992).

trademark protection, however, we must determine whether Congress authorized the Commissioner of Patents and Trademarks and the TTAB to interpret § 45 of the Act.

In 35 U.S.C. § 6 (1988), Congress explicitly granted the Commissioner the duty of administering the Act, including rule making. The Commissioner also is a member of the adjudicative body of the Patent and Trademark Office, the TTAB. 35 U.S.C. § 7 (1988). The Supreme Court recognized the authority of the Commissioner and the TTAB to interpret the Act in *Graham v. John Deere Company*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966):

> [i]t is the duty of the Commissioner of Patents and of the courts in the administration of the patent system to give effect to the constitutional standard by appropriate application, in each case, of the statutory scheme of Congress.

*Id.* at 6, 86 S.Ct. at 688. The Commissioner could not administer the Act, and the TTAB could not resolve issues arising in trademark applications under the Act, without interpreting § 45 to discern whether product configurations were eligible for trademark status. Of course, the TTAB's decisions are subject to judicial review, 15 U.S.C. § 1071 (1988); *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981), but the TTAB must interpret § 45 in the first instance to determine whether product configurations qualify as trademarks. *See Condo*, 1 F.3d at 605.

The third and final inquiry in the *Chevron* analysis is whether the TTAB conclusion that product configurations are eligible for trademark status is based on a permissible construction of § 45 of the Act. The persuasiveness of the TTAB and the Federal Circuit's interpretation of § 45 is reinforced by the legislative history accompanying the 1988 Lanham Act amendments. *See* Trademark Law Revision Act of 1988, Pub.L. 100–667, § 38, S.Rep. 515, 100th Cong., 2d Sess. 44 (1988), *reprinted in*, 1988 U.S.C.C.A.N. 5577, 5607. Although these amendments did not take effect until November 1989, approximately two years after the TTAB's decision in this case, as a codification of prior case law they validate the uniform preamendment interpretation of § 45 on the Act. The Senate Report accompanying the 1988 amendments specifically states "the words 'symbol or device,'" were retained in the Trademark Revision Act's revised definition of trademark "so as not to preclude the registration of colors, shapes, sounds *or configurations* where they function as trademarks." S.Rep. 100–515, 100th Cong., 2d Sess. at 44, *reprinted in*, 1988 U.S.C.C.A.N. at 5607 (emphasis added). Congress thus specifically approved the broad judicial interpretation of § 45's definition of "trademark" to include product configurations. In light of uniform and persuasive judicial authority and the subsequent congressional approval of those judicial interpretations of § 45, we conclude Congress intended that product configurations were eligible for trademark status under § 45 of the Lanham Act. Therefore, we hold now, as we have in the past, that § 45 of the Act allows product configurations to be eligible for trademark status. *See Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176 (7th Cir.1989); *Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118 (7th Cir.1988); *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 337 (7th Cir. 1985). Having determined that the TTAB's construction of § 45 is permissible and is consistent with our construction thereof, we turn to the specific challenges to the TTAB's interpretation.

In its brief, Kohler restates essentially two arguments in various forms. Initially, Kohler argues that granting trademark protection to product configurations impermissibly conflicts with the Patent Clause of the United States Constitution and the implementing patent law because it is the equivalent of a perpetual patent. Second, Kohler alleges trademark protection for product configurations is anticompetitive and inhibits product development because it precludes manufacturers from using product configurations resembling trademarked configurations.

## A.

## TRADEMARK PROTECTION IS NOT EQUIVALENT TO A PERPETUAL PATENT

Kohler asserts that granting trademark protection and allowing trademark registra-

tion for a product configuration directly conflicts with the rationale of the Constitution's Patent Clause[6] and the Patent Act, 35 U.S.C. §§ 1–376 (1988). Kohler alleges that the Supreme Court's interpretation of the Patent Clause in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146, 109 S.Ct. 971, 975, 103 L.Ed.2d 118 (1989); *Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), indicates that the TTAB and lower courts' interpretation of the Act to allow trademark protection for product configurations contravenes the Patent Clause's requirement that the exclusive right to "Writings and Discoveries" be for a "limited Time[ ]." To analyze the soundness of Kohler's claim that courts' interpretation of the Act runs afoul of the Patent Clause and implementing patent law, a brief discussion of the purpose of each is necessary.

To obtain patent protection, an applicant has to show that an invention or design is both novel and "not obvious at the time the invention was made to a person having ordinary skill in the art to which said art pertains." 35 U.S.C. § 103 (1988). Patent protection is limited in duration: utility patents last for seventeen years, 35 U.S.C. § 154 (1988), and design patents extend for fourteen years, 35 U.S.C. § 173 (1988). The innovation passes into the public domain after the patent expires.

Compared to patent protection, trademark protection is relatively weak because it precludes competitors only from using marks that are likely to confuse or deceive the public. Trademark protection is dependent only on public reaction to the trademark in the marketplace rather than solely on the similarity of the configurations. *See* Jay Dratler, *Trademark Protection for Industrial Designs*, 1988 U.Ill.L.Rev. 887, 896 (1988) [hereinafter Dratler, *Industrial Designs*].

An applicant for trademark protection need prove only that the proposed trademark is distinctive; that is, that it is either arbitrary, suggestive, or descriptive and has secondary meaning.[7] Although patent rights are limited in duration by statute, trademark rights may continue as long as the mark is used to distinguish and identify. Significantly, while a patent creates a type of monopoly pricing power by giving the patentee the exclusive right to make and sell the innovation, a trademark gives the owner only the right to preclude others from using the mark when such use is likely to cause confusion or to deceive. *See* 1 McCarthy on Trademarks § 2.05[1].

In *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), the Supreme Court described the policies underlying the federal patent law as follows:

First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

*Id.* at 262, 99 S.Ct. at 1099 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480–81, 94 S.Ct. 1879, 1885–86, 40 L.Ed.2d 315 (1974)). As the Third Circuit noted in *Merchant & Evans v. Roosevelt Building Products*, 963 F.2d 628 (3d Cir.1992), "[t]he keystone of patent law is originality. In exchange for making public an innovation in utility or design, the patent laws grant the innovator a temporary monopoly, after which the innovation passes into the public domain." *Id.* at 639.

The Supreme Court identified the policies promoted by federal trademark law in *Park 'N Fly, Inc. v. Dollar Park and Fly*,

---

6. The United States Constitution's Patent Clause gives Congress the power:
> To promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and discoveries.

U.S. Const. art. I, § 8, cl. 8.

7. Section 45 of the Act, which contains the statutory definition of "trademark," states that the word, name, symbol or device must be used "to identify ... and distinguish" the trademark owners' goods "from those manufactured or sold by others." 15 U.S.C. § 1127 (1988).

*Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985):

> The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.

*Id.* at 198, 105 S.Ct. at 663; *see also* 15 U.S.C. § 1127 (listing purposes of Lanham Act).

Kohler forthrightly concedes that in *W.T. Rogers Co. v. Keene,* 778 F.2d 334 (7th Cir.1985), this court considered and rejected the claim that granting trademark protection for product configurations conflicts with the Patent Clause and patent law. As Judge Posner noted in *W.T. Rogers:*

> provided that a defense of functionality is recognized, there is no conflict with federal patent law, save possibly with 35 U.S.C. § 171, which allows a 14–year patent to be granted for a nonfunctional ornamental design—a design patent. But the courts that have considered the issue have concluded, rightly in our view, that this section does not prevent the enforcement of a common law trademark in a design feature. See discussion in 1 Chisum, Patents § 1.04[6]

(1985). The trademark owner has an indefinite term of protection, it is true, but in an infringement suit must also prove secondary meaning and likelihood of confusion, which the owner of a design patent need not do; there is therefore no necessary inconsistency between the two modes of protection.

*Id.* at 337.[8]

In sum, courts have consistently held that a product's different qualities can be protected simultaneously, or successively, by more than one of the statutory means for protection of intellectual property. *See, e.g., Bonito Boats,* 489 U.S. at 154, 109 S.Ct. at 979 (federal patent laws do not preclude states from enacting regulations to protect business's use of trademarks, labels, or trade dress to prevent consumer confusion); *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476–78, 94 S.Ct. 1879, 1883–84, 40 L.Ed.2d 315 (1974) (patent protection extends to elements not adequately protected by copyright); *Application of Mogen David Wine Corp.,* 328 F.2d 925, 930 (C.C.P.A.1964) (Trademark rights that happen to continue beyond the expiration date of a patent on the same product do not extend the patent grant, because the two forms of protection "exist independently ... under different law and for different reasons."); *In re Yardley,* 493 F.2d 1389, 1394 (C.C.P.A.1974) (because "Congress has not provided that an author-inventor must elect between securing a copy-

---

**8.** Kohler questions the reasoning in *W.T. Rogers* by noting that likelihood of confusion relates only to whether there has been an infringement, not whether product configuration is entitled to trademark protection in the first place. Of course, the "likelihood of confusion" requirement referred to in *W.T. Rogers* for infringement actions emphasizes that a trademark right is not equivalent to a patent right. A design patent gives the patentee a virtually absolute monopoly in the design, while a trademark allows competitive uses of a protected design so long as such uses do not create consumer confusion. We disagree with Kohler's claim that the test for infringement in a design patent case is "essentially the same" as the infringement test for a trademark infringement case. Kohler maintains that this purported equivalency in the two tests indicates that design patent plaintiffs must establish "some degree of product recognition among purchasers." Kohler oversimplifies. The test for trademark infringement requires proof that

the trademark has acquired secondary meaning or is a distinctive, identifying mark, and that consumers are likely to be confused by the similarity of appearance. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1182 (7th Cir.1989). Likelihood of confusion is measured by considering numerous factors; similarity of appearance is only one of those factors. *See id.* at 1185; *Wesley–Jessen, Div. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 866 (7th Cir.1983).

By contrast, infringement of a design patent is established by proof that the designs look alike to the eye of the ordinary observer. *See Gorham Co. v. White,* 81 U.S. 511, 528, 20 L.Ed. 731 (1872). "For a design patent to be infringed, however, no matter how similar two items look, 'the accused device must appropriate the novelty in the patented device that distinguishes it from the prior art.'" *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444 (Fed.Cir.1984) (quoting *Sears Roebuck & Co. v. Talge,* 140 F.2d 395, 396 (8th Cir.1944)).

right or securing a design patent," the court allowed both forms of protection to stand); *see also Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 172 (2d Cir.1991) (Winter, C.J., concurring in part and dissenting in part) (there are "fine but important distinctions between the legal protections offered by design patents, copyrights and trademarks"); *see generally* Dratler, *Industrial Designs*, 1988 U.Ill.L.Rev. 887, 922–24, 936–37.

Kohler disagrees with our view that patent and trademark law are distinct areas of law. Instead, Kohler maintains that in light of the Supreme Court's holdings in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), and *Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), Moen's faucet and faucet handle are not protected under the Act because unpatented goods may be freely copied. In all three cases that Kohler relies upon, the Supreme Court examined state unfair competition laws to evaluate whether federal patent law preempted their application. The Court in each case held that a state's unfair competition laws could not extend patent-like protection to otherwise unprotected designs because such protection conflicted with the federal policy expressed in the patent clause and patent laws of generally free trade in unpatented design and utilitarian concepts. *See Bonito Boats,* 489 U.S. at 152–54, 109 S.Ct. at 978–79 (discussing *Sears* and *Compco* decisions). We disagree with Kohler's sweeping conclusion that the Supreme Court's holdings in *Sears, Compco,* and *Bonito Boats* preclude trademark protection for product configurations.[9]

In the *Sears/Compco* decisions, the Supreme Court reviewed two decisions from this court which held that Illinois unfair competition law prohibited unauthorized copying of unpatentable lighting fixture designs. The

**9.** In agreeing with Kohler's contentions, the dissent fundamentally departs from our interpretation of the Lanham Act as applied to product configurations by viewing this judicially accepted application of the Act as conferring patent-like protection. Only if one accepts the dissent's characterization of federal trademark protection as "patent-like" can the snippets of dicta drawn from Supreme Court cases involving state laws conferring perpetual patent-like protection be viewed as indirect support for the dissent's position. We believe that our discussion of the relevant Supreme Court cases supports our holding and refutes Kohler's claim that the Court has hinted in dicta that product configurations are not entitled to the limited protection available under the Lanham Act.

The dissent's characterization of *Clemens v. Belford, Clark & Co. (The "Mark Twain" case)*, 14 F. 728 (C.C.Ill.1883), as "analogous to the present problem" and as a rejection of Mark Twain's "effort to acquire what amounted to copyright protection in the name of a trademark" misconstrues that court's holding. This interpretation of *Clemens* demonstrates the contortions the case law must undergo to reach the dissent's conclusion that Lanham Act protection for product configurations is the equivalent of a perpetual patent. Contrary to the dissent's reading of *Clemens*, the court did not rule out trademark protection to the author's use of his pen name. Rather, the court simply held that because Twain had not obtained a copyright in his works, his writings had been dedicated to the public and anyone could publish them if they properly identified the writings as Twain's. Twain's trademark infringement claim was a loser because he did not (and could not) allege that the defendants had falsely identified the origin of the published works. There was minimal risk that the public would be confused as to the source because the defendants clearly identified Mark Twain as the author; Twain simply resented that the publisher would profit due to his failure to obtain copyright protection. The court expressly stated that had Twain alleged that the defendants used his name to pass off another writer's product as Twain's writings "perhaps he would have made a case entitling him to some relief." *Id.* at 732; *see also Chamberlain v. Columbia Pictures Corp.*, 186 F.2d 923, 925 (9th Cir.1951) (Mark Twain's heirs sued claiming that film of a "corny love story" loosely based on "The Celebrated Jumping Frog of Calaveras County" and billed as "Mark Twain's Favorite Story" violated the Lanham Act. No trademark violation was found because there was no likelihood of confusion.); *Geisel v. Poynter Prods., Inc.*, 295 F.Supp. 331, 351–55 (S.D.N.Y.1968) (Use of plaintiff's name "Dr. Suess" regarding promotion and sale of dolls so as to create the false impression that the plaintiff designed, manufactured, or authorized the dolls violated the Lanham Act. Subsequent truthful promotional statements that the dolls were "based on" the plaintiff's drawings were not trademark violations.). In sum, none of the cases cited by the dissent have treated trademark protection under the Lanham Act (or under state unfair competition laws no more protective than the Lanham Act) as a perpetual extension of a copyright or a patent.

Supreme Court held in both cases that federal copyright and patent law preempted the state unfair competition law which prohibited the copying of a nonpatented product. *Sears,* 376 U.S. at 231–32, 84 S.Ct. at 789; *Compco,* 376 U.S. at 237–38, 84 S.Ct. at 782. Kohler argues that because state unfair competition and federal trademark law serve the same purpose, federal patent law also conflicts with federal trademark law.[10] Kohler is mistaken. First, no Lanham Act issue was raised in either *Sears* or *Compco;* the decision in each case was based on the Supremacy Clause. Second, the Court in *Compco* noted that a defendant may copy at will if the design is "not entitled to a design patent *or other federal statutory protection....*" *Compco,* 376 U.S. at 238, 84 S.Ct. at 782. Of course, the Lanham Act falls under the rubric of "other federal statutory protection," and courts have expressly held that *Sears* and *Compco* do not preclude federal trademark protection of designs. *See, e.g., Esercizio v. Roberts,* 944 F.2d 1235, 1241 (6th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992); *In re Teledyne Indus., Inc.,* 696 F.2d 968, 971 n. 4 (Fed.Cir. 1982); *Dallas Cowboys Cheerleaders, Inc. v.*

*Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979); *In re Honeywell, Inc.,* 497 F.2d 1344, 1349 (C.C.P.A.1974); *Rolls Royce Motors, Ltd. v. A & A Fiberglass, Inc.,* 428 F.Supp. 689, 692 (N.D.Ga.1977).

In *Bonito Boats,* the Supreme Court unanimously held that a Florida statute granting perpetual patent-like protection to a boat hull design already on the market conflicted with federal patent law and was therefore invalid under the Supremacy Clause. In arriving at this holding, the Court reaffirmed the proposition stated in *Sears* and *Compco* that "publicly known design and utilitarian ideas which were unprotected by patent occupied much the same position as the subject matter of an expired patent"—they were unprotected. *Bonito Boats,* 489 U.S. at 152, 109 S.Ct. at 978. Kohler seizes upon this language as a broad proclamation that the preemption principles set forth in *Sears* and *Compco* stand unaltered. Kohler argues that *Bonito Boats* reaffirmed the *Sears* and *Compco* and that the preemption principles set forth in those cases should be read to preclude federal trademark protection for product configurations.

---

**10.** An exaggeration of the relationship between the Lanham Act and state law of unfair competition leads the dissent, in our view, to erroneously conclude that the Lanham Act merely federalizes the common law of trademarks and unfair competition. Dissent at 646–647. The Lanham Act was drafted in *reaction* to draconian state trademark legislation that threatened to interfere with interstate commerce. *See* Rogers, "The Lanham Act & the Social Function of Trademarks," 14 Law & Contemp.Probs. 173, 177–84 (1949); *McCarthy on Trademarks,* § 5.04, p. 5–10. The Lanham Act and state common law are independent of each other, although the standards of federal registrability use terminology similar to state common law trademark standards. *See NLRB v. Natural Gas Utility Dist.,* 402 U.S. 600, 603–04, 91 S.Ct. 1746, 1749, 29 L.Ed.2d 206 (1971) (absent plain indication to the contrary, Congress does not intend to make application of its statutes dependent upon state law). That the Supreme Court has held that extraordinarily protective state trademark law runs afoul of the Patent Clause and Patent Act does not threaten the constitutionality of the Lanham Act as courts have applied it. The Lanham Act differs in many respects from the common law standards. As one commentator has noted:

> Things such as service marks, collective and certification marks, are federally registrable, even though their common law status is doubt-

ful. Conversely, although corporate and commercial trade names are protected by the common law, they are *not* federally registrable. *McCarthy on Trademarks,* § 7.33[2] (footnotes omitted).

The Lanham Act as written and applied is not "exactly the same" as the state laws at issue in *Sears, Compco,* and *Bonito Boats.* Thus, this court's holding, and that of every circuit to consider the issue, does not create any conflict with the Constitution, the patent laws, or Supreme Court decisions. The dissent's conjuring up of the specter of design patents "made perpetual by trademarking the design" is inapposite to our holding and the facts of this case. First, there is no indication that Moen ever had or could qualify for a design patent on its products. Second, federal trademark protection does not transform the durationally limited monopoly of a design patent into a perpetual right. As we have noted, federal trademark protection for a product's configuration does not create a *monopoly* in the use of the product's shape. Moen is not "free from effective competition in the market for a popular brand of faucet." Dissent at 650. Moen simply has the right to preclude others from copying its trademarked product for the purpose of confusing the public as to its source. Kohler is free to copy Moen's design so long as it insures that the public is not thereby deceived or confused into believing that its copy is a Moen faucet.

As in *Sears,* however, the *Bonito Boats* Court recognized that states have the power to give unfair competition and trademark protection to trade dress.[11] In rejecting a broad preemptive argument that would preclude states from protecting trade dress (an argument Kohler contends applies to federal trademark protection for product configuration), the Court stated:

> That the extrapolation of such a broad pre-emptive principle from *Sears* is inappropriate is clear from the balance struck in *Sears* itself. The *Sears* Court made it plain that the States "may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods." ... Trade dress is, of course, potentially the subject matter of design patents. See *W.T. Rogers Co. v. Keene,* 778 F.2d 334, 337 (CA7 1985). Yet our decision in *Sears* clearly indicates that the States may place limited regulations on the circumstances in which such designs are used in order to prevent consumer confusion as to source. Thus, while *Sears* speaks in absolutist terms, its conclusion that the States may place some conditions on the use of trade dress indicates an implicit recognition that all state regulation of potentially patenta-

ble but unpatented subject matter is not *ipso facto* pre-empted by the federal patent laws.

*Bonito Boats,* 489 U.S. at 154, 109 S.Ct. at 979. The Court's holding in *Bonito Boats* is also inapplicable to federal trademark law because the Florida statute granted boat manufacturers patent-like rights far exceeding any right available under the Lanham Act.[12] The Court described the Florida statute as endowing boat manufacturers protected by the state statute with much greater rights than are available under federal patent law:

> [T]he Florida statute at issue here ... offers protection beyond that available under the law of unfair competition or trade secret, without any showing of consumer confusion, or breach of trust or secrecy.
>
> \* \* \* \* \* \*
>
> The Florida law substantially restricts the public's ability to exploit an unpatented design in general circulation, raising the specter of state-created monopolies in a host of useful shapes and processes for which patent protection has been denied or is otherwise unobtainable. It thus enters a field of regulation which the patent laws have reserved to Congress.

*Id.* at 167, 109 S.Ct. at 986. As described earlier in this opinion, the underlying policies

**11.** We have defined "trade dress" as "the total image of a product, including such features as 'size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 935 (7th Cir.1989) (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). This broad definition of trade dress as applied by the courts includes product configurations. *See McCarthy on Trademarks* § 7.23[2]. The only distinction courts make between trade dress generally and product configuration cases in particular is to require plaintiffs asserting a claim for infringement of trade dress in product configuration under § 43(a) of the Lanham Act to prove secondary meaning because a product's shape is never inherently distinctive. *Id.* (collecting cases). This distinction is irrelevant in this case because Kohler does not dispute that Moen's products have acquired secondary meaning.

**12.** The Supreme Court granted *certiorari* in *Bonito Boats* to resolve a conflict created when the

Florida Supreme Court struck down that state's statute prohibiting the use of a direct molding process to duplicate unpatented boat hulls. The Florida court held that the Florida law conflicted with Congress's balance in the federal patent statute between the encouragement of invention and free competition in unpatented ideas. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 515 So.2d 220 (1987). The Court of Appeals for the Federal Circuit had previously upheld a similar California law. *See Interpart Corp. v. Italia,* 777 F.2d 678 (1985). The Federal Circuit concluded that the California law prohibiting the use of the direct molding process to duplicate unpatented articles did not conflict with the policies behind the federal patent laws. The Supreme Court found the Federal Circuit's "reasoning [to be] defective in several respects." *Bonito Boats,* 489 U.S. at 163–64, 109 S.Ct. at 984. Nonetheless, after recounting the Federal Circuit's errors, the Court re-emphasized that "[a]s *Sears* itself makes clear, States may place limited regulations on the use of unpatented designs in order to prevent consumer confusion as to source." *Id.* at 165, 109 S.Ct. at 985.

of federal trademark law, and the nature of the protection afforded, do not approximate the sweeping, perpetual patent-like state statutes that the Supreme Court found impermissible in *Sears, Compco,* and *Bonito Boats.*

In *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), the Supreme Court held that if a restaurant's trade dress is inherently distinctive under § 43(a) of the Act, 15 U.S.C. § 1125(a), there is no requirement that the business also prove secondary meaning to obtain protection under the Lanham Act. To reach this issue, however, the Court first had to accept that trade dress is a protectable trademark. *Id.* at ——, 112 S.Ct. at 2759. The Court criticized the Second Circuit's line of decisions refusing trademark protection for "unregistered but inherently distinctive marks of all kinds, whether the claimed mark used distinctive words or symbols *or distinctive product designs.*" *Id.* at ——, 112 S.Ct. at 2759 (emphasis added). In holding that inherently distinctive trade dress was entitled to protection under the Act, the Court noted:

> Protection of trade dress, no less than of trademarks, serves the Act's purpose to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation."

*Id.* at ——, 112 S.Ct. at 2760 (quoting *Park 'N Fly,* 469 U.S. at 198, 105 S.Ct. at 663).

The Court was not directly confronted in *Two Pesos* with the issue of whether product configurations were protected trade dress under § 43 of the Act. Nonetheless, the Court's discussion of the Fifth Circuit's approach to trade dress protection suggested that any conflicts between the patent laws and the Lanham Act should be resolved by a careful application of traditional bases for determining the propriety of trademark protection such as likelihood of confusion, functionality, and distinctiveness:

> Suggestions that under the Fifth Circuit's law, the initial user of any shape or design would cut off competition from products of like design and shape are not persuasive. Only nonfunctional, distinctive trade dress is protected under § 43(a). The Fifth Circuit holds that a design is legally functional, and thus unprotectable, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection. . . . This serves to assure that competition will not be stifled by the exhaustion of a limited number of trade dresses.

*Id.* at ——, 112 S.Ct. at 2760–61 (citation omitted).

 Kohler's contention that even a remote potential for conflict between trademark law and design patent law requires the reversal of this circuit's settled precedent and rejection of the uniform holdings of every court to consider the issue, ignores the Supreme Court's observation in *Two Pesos* that sensitive application of the principles governing trademark recognition can avert the threat of a perpetual trademark "monopoly." *See also* Dratler, *Industrial Design,* 1988 U.Ill.L.Rev. 887, 936 ("Because trademark principles reveal their potential for conflict with patent goals only when applied to specific facts, courts should attempt to achieve that harmony by analyzing the conflict in the context of specific facts. In short, any perceived conflict should be resolved not on the face of the law, but only on the law as applied."). Furthermore, a fundamental rule of statutory construction requires that statutes are to be construed, if possible, in harmony with the Constitution and other applicable statutes. *See New York v. Ferber,* 458 U.S. 747, 769 & n. 24, 102 S.Ct. 3348, 3361 & n. 24, 73 L.Ed.2d 1113 (1982) (collecting cases). Indisputably, some of the concerns expressed in *Sears, Compco,* and *Bonito Boats* regarding state law conflicts with the patent laws are also valid with respect to federal legislation. It could be argued that Congress could conceivably enact legislation

conferring perpetual patent-like monopolies that would conflict with the patent clause's requirement that exclusive rights to authors and inventors be only "for limited Times." U.S. CONST. art. I, § 8, cl. 8. It is apparent, however, that perpetual trademark protection under the Lanham Act for a product configuration or design is not the equivalent of impermissible perpetual patent protection.

Kohler has conceded that under the facts of this case, Moen satisfied all of the requirements for trademark protection for product configurations. The Supreme Court's holdings and dicta in *Sears, Compco, Bonito Boats,* and *Two Pesos* offer no reason for this court to hold that every court that has allowed federal trademark protection for product configurations was mistaken.

### B.

### TRADEMARK PROTECTION IS NOT ANTICOMPETITIVE

Kohler also alleges that allowing trademark protection for product configurations is anticompetitive and inhibits product development. Rather than extending trademark protection to product configurations, Kohler argues, courts should refuse such protection and require manufacturers to label their products to prevent consumer confusion. Finally, Kohler maintains that any change in the extent of trademark protection accorded to product configurations should come only from Congress.

Kohler contends that granting trademark protection to product configurations conflicts with public policy favoring competition and disfavoring monopolies. As we noted earlier, trademarks are not monopolies. Others can produce designs similar to the trademark so long as there is no likelihood of consumer confusion. Furthermore, Kohler conceded in the district court that granting trademark protection to Moen will not preclude others from making faucets or faucet handles. We recognized in *W.T. Rogers Co. v. Keene,* 778 F.2d at 339, that granting trademark protection to a nongeneric and nonfunctional product design does not stifle competition. We noted that, "[s]ince the supply of distinctive names and symbols usable for brand identifi-

cation is very large, indeed for all practical purposes infinite, competition is not impaired by giving each manufacturer a perpetual 'monopoly' of his identifying mark; such marks are not a scarce input into the production of goods." *W.T. Rogers,* 778 F.2d at 339.

Kohler admits the configuration of Moen's faucet and faucet handle is not functional; i.e. the trademarked feature would not be "found in all or most brands of the product even if no producer had any desire to have his brand mistaken for that of another producer.... [A] functional feature is one which competitors would have to spend money not to copy but to design around." *W.T. Rogers,* 778 F.2d at 339; *see also Schwinn Bicycle,* 870 F.2d at 1188–89; *Service Ideas, Inc. v. Traex Corp.,* 846 F.2d 1118, 1123 (7th Cir.1988). Kohler has not challenged Moen's claim that the configuration of its faucet and faucet handle is designed solely to differentiate the source of these particular products from those of other manufacturers. We decline to accept Kohler's invitation to overrule our decisions holding that functionality is a valid criterion for evaluating the propriety of trademark protection.

Kohler's claim that trademark protection for product configurations undermines product development is both unpersuasive and unsupported. As discussed earlier, such a conclusion is possible only if the underlying policies and protections of federal trademark and patent law are ignored. Patents encourage the type of innovation that advances the progress of "Science and the useful Arts," and patent law imposes a high standard for patentable protection and limits patent grants to a fixed term. Trademark law protects a producer's right to select an identifying name or symbol for his brand and exclude others from using it. Moreover, "[j]ust as the economic rewards of trademark protection encourage discovery and invention, so do the economic rewards of trademark protection encourage creative effort in marketing." Dratler, *Industrial Designs,* 1988 U.Ill.L.Rev. 887, 927–28. Innovation in product design and marketing for the purpose of enhancing producer identity reduces the costs to consumers of informing themselves about the product source so that they can

either continue purchasing the products from particular producers or avoid the products from those producers altogether. *See W.T. Rogers,* 778 F.2d at 338; *see also* Note, *Promotional Goods and the Functionality Doctrine: An Economic Model of Trademarks,* 63 Tex.L.Rev. 639, 656–62 (1984).

Kohler's contention that Congress must amend federal trademark law to rectify the lower courts' "novel and expansive interpretation of the trademark laws" was undermined by the Supreme Court in *Bonito Boats.* There the Court noted that Congress's adoption of § 43(a) of the Lanham Act and the longstanding coexistence of the patent statute with unfair competition law are "affirmative indications" that unfair competition law is "consistent with the [policy] balance struck by the patent laws." *Bonito Boats,* 489 U.S. at 166, 109 S.Ct. at 985. As noted earlier, we perceive no unavoidable conflict between the patent law and federal trademark law as applied to product configurations.

## IV. CONCLUSION

The district court's judgment is AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

The majority opinion is an admirably lucid presentation of the point of view adopted by the Court of Appeals for the Federal Circuit and its predecessor, the Court of Customs and Patent Appeals, during about the last twenty years. Unfortunately, this view notoriously lacks the support and endorsement of the Supreme Court. *See Application of Honeywell, Inc.,* 497 F.2d 1344 (C.C.P.A.), *cert. denied,* 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974); *In re Teledyne,* 696 F.2d 968 (Fed.Cir.1982).[1] *See also* John Pegram, *Trademark Protection of Product and Container Configurations,* 81 Trademark Rep. 1, 5–18 (1991); Jay Dratler, Jr., *Trademark Protection for Industrial Designs,* 1988 U.Ill. L.Rev. 887 (1988). In adopting the position

that the configuration or design of products themselves may be the subject of federal trademark protection, the Federal Circuit and the courts that have followed it seem to have taken lightly the emphasis placed on the *right to copy* by decisions of the Supreme Court not only recently but stretching back for a century. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Sears, Roebuck & Co. v. Stiffel,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *Singer Mfg. Co. v. June Mfg. Co.,* 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118 (1896). While I have the greatest respect for the Federal Circuit, its decisions do not bind us. I think those decisions should not be followed when they seem to be so much in conflict with relevant Supreme Court authority. The essential issue before us is whether to follow lower court cases that lack the endorsement of the Supreme Court and that defeat the important right to copy unpatented articles recently proclaimed yet again by the Supreme Court in *Bonito Boats,* 489 U.S. at 151–153, 109 S.Ct. at 977–79. *See also* Pegram, *Trademark Protection,* at 18–23. This is a crucially important issue for the maintenance of a free and competitive economy. We should not hesitate to go back to fundamentals in the analysis of the problem.

The majority correctly states the two basic arguments presented by Kohler for denying federal trademark registration to product configurations. Kohler contends that the practice is an unconstitutional violation of the Patent Clause of the Constitution *and* is anticompetitive. These are both fundamental questions and the majority has been unable to answer them at a fundamental level.

The Supreme Court has made clear that the patent monopoly which may be secured by obtaining a design patent on a product may not be indefinitely extended through the

---

1. While Moen and the majority on the subject of product configuration trademarks trace the relatively recent departure of the Federal Circuit from *Application of Mogen David Wine Corp.,* 328 F.2d 925 (C.C.P.A.1964), that case involved not the configuration of the product itself (wine) but

the shape of a wine *bottle*—a container. *See Application of Mogen David Wine Corp.,* 372 F.2d 539, 544 (C.C.P.A.1967) (Smith J., concurring) (later proceeding). *Mogen David* did not therefore directly confront the issue raised here, although it lays some of the groundwork.

use of a federal trademark on the product configuration. Thus, in *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), the Court summarized the rationale for this rule:

> The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. Hence any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, *whatever the legal device employed*, runs counter to the policy and purpose of the patent laws....
>
> By the force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly. *Hence we have held that the patentee may not exclude the public from participating in that good will or secure, to any extent, a continuation of his monopoly by resorting to the trademark law and registering as a trademark any particular descriptive matter appearing in the specifications, drawings or claims of the expired patent, whether or not such matter describes essential elements of the invention or claims.*

*Id.* at 256, 66 S.Ct. at 104–05 (emphasis supplied) (citations omitted).

In *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118 (1896), Singer made patented sewing machines for several years having a distinctive form and appearance. 163 U.S. at 175, 16 S.Ct. at 1004. After the expiration of the principal patents, June Manufacturing Company began making sewing machines with the same appearance. *Id.* Singer complained that June, "for the purpose of inducing the belief that sewing machines manufactured and sold by it [June] were made by [Singer], was making and selling machines of the exact size, shape, ornamentation, and general appearance as" Singer's machines. *Id.* at 170, 16 S.Ct. at 1002. The Court refused to enjoin the copying of Singer's product configuration and held:

It is self-evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property. It is upon this condition that the patent is granted. *It follows, as a matter of course, that on the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent.* We may, therefore, dismiss without further comment the complaint as to the form in which the defendant made his machines.

*Id.* at 185, 16 S.Ct. at 1008 (emphasis supplied).

In *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) the shredded wheat biscuit was the subject of a design patent held by National Biscuit covering the pillow-shaped form. Upon the expiration of the patent, the Court allowed Kellogg to manufacture the same biscuit under the name "shredded wheat." The Court held that "upon expiration of the patents the form ... was dedicated to the public." 305 U.S. at 119–20, 59 S.Ct. at 114.

Certainly, if the Patent Clause gives the right to copy an article which was once covered by a patent, the public must also retain the right to copy an article which has never been even temporarily removed from the public domain by reason of being patented. Thus, in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), Sears copied and sold at a lower price a pole lamp marketed by Stiffel. *Id.* at 226, 84 S.Ct. at 786. The Court in upholding Sears said:

> An unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so. What Sears did was to copy Stiffel's design and to sell lamps almost identical to those sold by Stiffel. This it had every right to do under the federal patent law.

*Id.* at 231, 84 S.Ct. at 789 (emphasis supplied).

In *Compco Corp. v. Day–Brite Lighting, Inc.*, in upholding Compco's right to market a

copy of a Day–Brite light fixture, the Court emphatically restated the constitutional policy in favor of free competition:

> To forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of *allowing free access to copy whatever the federal patent and copyright laws leave in the public domain.* Here Day–Brite's fixture has been held not to be entitled to a design or mechanical patent. Under the federal patent laws it is, therefore, in the public domain and can be copied in every detail by whoever pleases. It is true that the trial court found that the configuration of Day–Brite's fixture identified Day–Brite to the trade because the arrangement of the ribbing had, like a trademark, acquired a "secondary meaning" by which that particular design was associated with Day–Brite. *But if the design is not entitled to a design patent or other federal statutory protection, then it can be copied at will.* [2]

376 U.S. at 237–38, 84 S.Ct. at 782 (emphasis supplied).

Finally and very clearly, in *Bonito Boats* the Court held that a Florida statute prohibiting the direct molding of unpatented boat hulls conflicted with the policy that product designs are dedicated to the public unless they are protected by a valid patent. 489 U.S. at 157–60, 109 S.Ct. at 981–82. The Court explained:

> [T]he federal standards for patentability, at a minimum, express the congressional determination that patent-like protection is unwarranted as to certain classes of intellectual property. The States are simply not free in this regard to offer equivalent protections to ideas which Congress has determined should belong to all. *For almost 100 years it has been well established that in the case of an expired patent, the federal patent laws do create a federal*

right to "copy and to use." *Sears* and *Compco* extended that rule to potentially patentable ideas which are fully exposed to the public.

*Id.* at 164–65, 109 S.Ct. at 984–85 (emphasis supplied).

*Bonito Boats* clearly affirmed the federal policy furthering the right to copy. The Court recognized as well that *Sears* did not preclude states from enacting laws to prevent consumer confusion through unfair competition laws. *Id.* at 154, 157–58, 109 S.Ct. at 979, 981. However, the majority opinion here seems to read into *Bonito Boats'* careful discussion of permissible state laws an exemption for any state or federal law dealing with trademarks or trade dress. But the Court only acknowledged that states could continue to enact unfair competition laws so long as, and to the extent that, they did not conflict with the federal policy embodied in *Sears/Compco*:

> '[S]tates are free to regulate the use of such intellectual property in any manner not inconsistent with federal law.' *At the same time, we have consistently reiterated the teaching of Sears and Compco that ideas once placed before the public without the protection of a valid patent are subject to appropriation without significant restraint.*

*Id.* at 156, 109 S.Ct. at 980 (citations omitted).

Moen—and the majority here—argue that *Sears, Compco* and *Bonito Boats* are concerned with the interface between federal patent law and the *state* law of unfair competition. The cases therefore merely involve application of the Supremacy Clause and federal preemption of state law. Superficially, this argument may have some appeal but it ignores the fact that the Lanham Act (comprising the federal law of trademarks and unfair competition) essentially federalizes the common law of trademarks and unfair com-

---

2. The phrase "other federal statutory protection" has been taken as a short cut to application of the Lanham Act to product configurations. *See* Pegram, *Trademark Protection*, at 19. The phrase, however, does not create an exception to the *constitutional* policy consistently pronounced in *Compco, Sears* and the cases we have discussed. Although the use of the phrase recog-

nizes the possibility of further congressional action, it does not preclude conflicts between such statutes and the constitution. Notably, when the Supreme Court re-affirmed the *Sears/Compco* doctrine in *Bonito Boats*, 489 U.S. at 154–57, 109 S.Ct. at 979–81, it omitted any such blanket reference to a federal exception. *See* Pegram, *Trademark Protection*, at 19–20.

petition. And the Lanham Act provides a federal trademark register to which generally recognized principles of notice may be applied. Therefore, the conflict that the Court found between state law and federal patent law as a prerequisite to preemption in *Sears, Compco* and *Bonito Boats* is exactly the same conflict as would develop between federal patent law and federal trademark law if a design patent could be made perpetual by trademarking the design. As a matter of commercial reality, therefore, the relation of patent law to state unfair competition law is exactly the same as its relation to federal trademark law.[3]

The conflict, then, is directly between a federal statutory scheme rooted in the Constitution and a federal codification of the common law.[4] As the Court noted in *Bonito Boats,* the Lanham Act's federalization of the common law of unfair competition reflects a congressional affirmation of policies that must be made conformable with the constitutionally rooted patent laws:

> Congress has thus given federal recognition to many of the concerns that underlie the state tort of unfair competition, and the application of *Sears* and *Compco* to nonfunctional aspects of a product which has been shown to identify sources must take account of competing federal policies in this regard.

489 U.S. at 166, 109 S.Ct. at 985. Mindful of the policies underlying federal trademark law as succinctly described by the majority here, we must determine whether any trademark interests served by recognizing entire products as trademarks are sufficiently weighty to defeat the crucial policies served by the patent laws.

What is at stake here is the right to copy the thing itself—that is, to copy its configuration or design. The configuration or design of a product is as generic as the name of the product. As the Supreme Court cases demonstrate, the constitutional right to copy after a patent expires or in the absence of a patent is the reciprocal of the constitutional right to prohibit copying for a limited term under the Patent Clause. To ignore this principle is to permit perpetual monopolies on product ideas or particular product designs and to inhibit product development. Kohler has provided some horrible examples of allowing federal trademark registration to substitute for the grant of a design patent. One example consists of what appears to be a simple white disc. This product is a round beach towel, which has been granted registration as a trademark on the Principal Register. The registrant presumably has a monopoly on the production of beach towels that are round. Other registrations (and monopolies) may follow for triangular beach towels, trapezoidal beach towels or whatever. As a result of the case now before us, only Moen

**3.** The majority argues that differences between stringent state unfair competition laws and the Lanham Act require us to distinguish the entire line of Supreme Court authority articulating a constitutional policy favoring a right to copy. I do not agree that one hundred years of policy can be ignored merely because the Lanham Act may differ somewhat from the state laws considered by the Court. The *conflict* posed by these state laws and the Lanham Act remains the same: whether trademark can be used as a back door to protection properly acquired by a design patent.

**4.** The majority opinion cites part of one paragraph of this court's opinion in *W.T. Rogers Co. v. Keene,* 778 F.2d 334 (7th Cir.1985), for the proposition that we have already decided that there is no conflict between patent law and trademark protection of product configurations. *See id.* at 337. I do not agree that *W.T. Rogers* disposed of this issue. In *W.T. Rogers,* Judge Posner traversed the rocky terrain of "functionality." He

indicated that although a functionality defense could avert a conflict between trademark and utility patent law, there might still be a clash with design patent law. *Id.* He pointed to the different standards for proving trademark and design patent infringement to harmonize the two modes of protection. But, respectfully, this is not an adequate answer to the anticompetitive features of trademark protection for product configurations. Judge Posner's conclusion that there is no "necessary inconsistency" between trademark and patent law does not, as the majority states, tell us there is no *possible* inconsistency. And indeed, this inconsistency arises when, as here, a company resorts to trademark law to protect the very product itself.

Moreover, I am not persuaded that passing references to trademarks for designs in *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), which does not even indirectly address the issues here, sheds any light on the conflict between patent law and trademarks for product configurations.

will be legally entitled to supply replacement handles for Moen faucets. Moen will have the equivalent of a perpetual design patent on its faucets and faucet handles—in violation of the Constitution.

Courts have attempted to reconcile any conflict between trademark and patent law by invoking the rubric of functionality. The functionality defense seeks to protect the integrity of the utility patent system by excepting from configuration trademarks those products for which trademark protection would result in a perpetual monopoly inconsistent with the utility patent laws. *Vaughn Mfg. Co. v. Brikam Int'l Inc.*, 814 F.2d 346, 349 (7th Cir.1987) ("The defense exists because granting exclusive rights to functional features of products is the domain of patent, not trademark, law."); *W.T. Rogers*, 778 F.2d at 338. No one questions that functional features not protected by a valid utility patent, or for which the patent has expired, are open to everyone to copy. Trademarks may not be acquired to defeat the right to copy. Yet Moen and the courts on which it relies (and the majority here) claim that this should not also be the case with respect to nonfunctional features when design patents are not available to protect them. *See Honeywell*, 497 F.2d at 1347–49.[5]

Yet there is no basis for treating the subject matter of design and utility patents differently: if functional matter not protected by a utility patent is available for all to copy, then it follows that ornamental or aesthetic designs not protected by design patents are also free for everyone to copy. Design and utility patents are created by the same law, 35 U.S.C. §§ 1–376 (1984). There is nothing in the patent law itself that would allow a distinction to be made between design and utility patents for purposes of extending trademark protection to one but not to the other. To the contrary, the law applicable to utility patents applies to design patents as well: "The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided." 35 U.S.C. § 171 (1984).

The argument for distinguishing between the subjects of design and utility patents is that, although freedom to copy functional features may be essential to competition, freedom to copy aesthetic features is not essential. *W.T. Rogers*, 778 F.2d at 339 (trademark for "ornamental, fanciful shapes and patterns" does not hinder competition). In this circuit, "functional means not simply that the feature serves a function, but that the feature is necessary to afford a competitor the means to compete effectively.... A feature is functional if it is one that is costly to design around or do without, rather than one that is costly to have." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1188–89 (7th Cir.1989). The Court of Customs and Patent Appeals described in even stronger terms "the public policy ... as not the *right* to slavishly copy articles which are not protected by patent or copyright, but the *need* to copy those articles, which is more properly termed the right to compete *effectively*." *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1339 (C.C.P.A.1982). *See also* Ralph Brown, *Design Protection: An Overview*, 34 U.C.L.A.L.Rev. 1341, 1359–74 (1987) (discussion of functionality in various circuits).

Courts have struggled with the obvious fact that design features can be as essential to competition—"functional"—as utilitarian features. Some have developed the doctrine of "aesthetic functionality" to reconcile this conflict. *See* Ralph Brown, *Design Protection*, at 1367–68. Although this circuit has apparently rejected that view, *W.T. Rogers*, 778 F.2d at 340, we have recognized that

---

**5.** This perhaps unfortunate distinction between the functional and the non-functional seems to have taken root in *Honeywell*. The Court of Customs and Patent Appeals recognized that trademark rights are not available for functional—defined as "in essence utilitarian or dictated by reasons of engineering efficiency"—subject matter disclosed in a utility patent because such protection would conflict with public policy favoring competition and the "right to copy." 497 F.2d at 1348. When trademark rights were sought for non-functional elements of a design patent, however, the court did not pursue the same policy. Rather, the court said it had "decided that the public interest—protection from confusion, mistake, and deception in the purchase of goods and services—must prevail over any alleged extension of design patent rights when a trademark is non-functional." *Id.*

"there may come a point where the design feature is so important to the value of the product to consumers that continued trademark protection would deprive them of competitive alternatives." *W.T. Rogers*, 778 F.2d at 347; *Schwinn*, 870 F.2d at 1191. More succinctly, we have found "beauty is function." *W.T. Rogers*, 778 F.2d at 343. At the same time, not all designs that enhance a product's appeal have been found to be "functional." *Schwinn*, 870 F.2d at 1191. We are therefore left with a significant "undistributed middle" in applying this doctrine to aesthetic features. Ralph Brown, *Design Protection*, at 1366–67.

This functional/nonfunctional dichotomy is purely judge-made and is not based on the patent law. Nor, for that matter, is it based on the trademark law. Patent law does not require that an invention—whether protected by a utility patent or by a design patent—be something that is essential for competition. For utility patents, the invention need only be useful, 35 U.S.C. § 101 (1984). Competitors often design around a utility patent. Design patents, on the other hand, protect ornamental designs of an article of manufacture, 35 U.S.C. § 171 (1984), whether or not they are essential for competition. If we are to rely on the patent law, we know that that which is not protected by a utility patent or that on which a utility patent has expired is free for everyone to copy, regardless whether the matter in question is needed to compete or not. The same should be true of design features which are unprotected by a design patent. It does not matter that the design may not be necessary for competition. And, in any event, the attempt to categorize product features as "essential" or "non-essential" for competition is perplexing and ultimately vain.

The "functionality" doctrine has proved to be at best an extremely fuzzy border between design patent and trademark law. While utility patents and trademarks usually encompass unrelated subject matter, Judge Rich accurately noted that "functionality, ornamental appearance, and good industrial design are matters which are closely intermingled. The very best product design has long been called functional design." *Honeywell*,

497 F.2d at 1351 (Rich, J., concurring). The line between nonfunctional and functional is difficult to draw and an obvious source of litigation.

It is also incorrect or irrelevant to say that there is no conflict between configuration trademarks and the design patent law, because in a trademark case a plaintiff must also prove secondary meaning and likelihood of confusion. Likelihood of confusion only relates to whether there has been an infringement, not whether a product configuration is entitled to protection in the first place. In fact, *Compco* explicitly rejected likelihood of confusion and secondary meaning as sufficient reasons to grant a monopoly:

> A State of course has power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity, deceive the public by palming off their copies as the original. *That an article copied from an unpatented article could be made in some other way, that the design is "nonfunctional" and not essential to the use of either article, that the configuration of the article copied may have a "secondary meaning" which identifies the maker to the trade, or that there may be "confusion" among purchasers as to which article is which or as to who is the maker, may be relevant evidence in applying a State's law requiring such precautions as labeling; however, and regardless of the copier's motives, neither these facts nor any others can furnish a basis for imposing liability for or prohibiting the actual acts of copying and selling.*

376 U.S. at 238, 84 S.Ct. at 782 (emphasis supplied). Even where a product configuration has achieved significance as an identifier of the source of the goods, the remedy is not to create a monopoly in the configuration. In *Kellogg v. National Biscuit*, the Court observed,

> [D]ue to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the prod-

650

uct is generally known, with the plaintiff's factory at Niagara Falls.

305 U.S. at 118, 59 S.Ct. at 113.

And the Court concluded:

> Where an article may be manufactured by all, a particular manufacturer can no more assert exclusive rights in a form in which the public has become accustomed to see the article and which, in the minds of the public, is primarily associated with the article rather than a particular producer, than it can in the case of a name with similar connections in the public mind. Kellogg Company was free to use the pillow-shaped form, subject only to the obligation to identify its product lest it be mistaken for that of the plaintiff.

305 U.S. at 120, 59 S.Ct. at 114.

Thus, in *Kellogg* the shape of National Biscuit's "shredded wheat" was held to be generic and unprotectable as a trademark even though it was associated in the public mind with a particular producer. The shape of the product was like its name. The appropriate method of identifying it with its producer was to mark it with the distinctive mark or name of its manufacturer—not to grant a monopoly on its shape. Adequate labeling is sufficient and is the appropriate way to avoid source confusion.

Granting trademark protection to product configurations conflicts directly and importantly with the public policy favoring competition and disfavoring monopolies and monopolistic practices. In *American Safety Table Co., Inc. v. Schreiber,* 269 F.2d 255 (2d Cir.), *cert. denied,* 361 U.S. 915, 80 S.Ct. 259, 4 L.Ed.2d 185 (1959), the Second Circuit declared:

> In approaching the question of whether Schreiber & Goldberg's copying of the Amco machine is actionable, it must be remembered that the interests and equities of the litigants at bar are not the only ones which must be considered. Indeed, the underlying principles of our competitive economy and the desirability of passing on to the American public the advances of technical progress not only are entitled to consideration, in fact they dominate the picture although the interests of the public are not represented by either of the parties to the action....

> [I]mitation is the life blood of competition. It is the unimpeded availability of substantially equivalent units that permits the normal operation of supply and demand to yield the fair price society must pay for a given commodity. [Citations omitted.] Unless such duplication is permitted, competition may be unduly curtailed with the possible resultant development of undesirable monopolistic conditions.

*Id.* at 271–72.

Chief Judge Charles E. Clark in dissent in *American Safety Table* put it even more strongly:

> We have only recently unequivocally reaffirmed these principles in *Modern Aids Inc. v. R.H. Macy & Co.,* 2d Cir., 264 F.2d 93, 94, where the court stated *Per Curiam:* "The plaintiff had no patent, and except for one proviso the defendant was free to imitate its machine as closely as it chose, no matter how much the competition might lessen the plaintiff's sales. That proviso was that, if the buying public had come to believe that every machine made after the plaintiff's model was the plaintiff's product, and had in any degree relied upon the source of the machine, rather than its performance, the plaintiff might have some relief. *Even then, however, the relief would go no further than to require the defendant to make plain to buyers that the plaintiff was not the source of the machines sold by it.*"

*Id.* at 281–82 (emphasis supplied).

It is also no answer to Kohler's argument that trademark registration for product configurations is anticompetitive to say that such a trademark creates only a relatively weak monopoly, or, as the majority contends, that it creates no "monopoly" at all. A restraint on competition need not be absolute to be effective. Kohler cannot copy Moen's unpatented faucet and handle unless it knows that Moen will be unable to prove a likelihood of confusion. At the end of the day, Moen has no patent, yet remains free from effective competition in the market for a popular brand of faucet.

Nor do I share the majority's belief that *Chevron* principles are of great consequence here, if they even apply. When the issue is the validity of a registered trademark, the U.S. Patent and Trademark Office's determination establishes a prima facie case of validity. 15 U.S.C. § 1115(a) (Supp.1993). But, when the issue is, as here, one of constitutional policy, the matter is clearly one to which the courts (and, in particular, the Supreme Court), as opposed to the agency, can speak with authority. In any event, the Patent and Trademark Office historically refused registration of overall product configurations as trademarks. *See Ex Parte Mars Signal–Light Co.,* 85 U.S.P.Q. (BNA) 173 (Comm.Patents 1950); *In re Duro–Test Corp.,* 134 U.S.P.Q. (BNA) 137 (TTAB 1962). Only when the Court of Customs and Patent Appeals took its misguided step in *Honeywell* in 1974 did the Patent and Trademark Office practice change. Further, it is common knowledge that the persistence of skilled intellectual property practitioners may eventually win registration for purported marks whose registrability is, to say the least, marginal. The courts must be vigilant to sustain constitutional limitations and to give appropriate weight to basic economic considerations like the need for competition.

With respect to the 1988 amendments of the Lanham Act, the list of trademarkable categories was not changed. Both sides claim that this indicates an intent of Congress to either favor or disfavor trademarks on product configurations. It seems to me that the congressional action or inaction shows very little one way or the other.

The effort to establish registrability of product configurations as trademarks is a bit like Samuel Clemens' attempt to register his nom de plume, "Mark Twain," as a trademark to prevent pirating of his novels. *The*
"Mark Twain" Case,* 14 F. 728, 730 (C.C.Ill. 1883). The court properly rejected this effort to acquire what amounted to copyright protection in the name of a trademark.[6] *Id.* at 731. The *"Mark Twain"* case is analogous to the present problem. Moen, like Clemens, seeks refuge in trademark law for protection that is properly only available through the design patent or copyright laws. Here too we should decline to allow the use of a trademark to, in effect, extend design patent protection for an indefinite term.

If the issue before us is a conflict between a well-defined statutory scheme (the design patent laws) enacted under a specific and limited constitutional directive (the Patent Clause) and a judicial doctrine (protection of product configurations as trademarks) only remotely incident to a general statutory scheme (the Lanham Act), the specific, constitutionally-mandated provisions should control. *See Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974).

In my view, whatever new law has been developed in the lower courts to authorize the use of product configuration trademarks as a substitute for design patents is without sanction from the Supreme Court. The Court has spoken repeatedly to disfavor the use of unfair competition law to avoid the "limited times" provision of the Patent Clause. The Court has emphasized the importance of the right to copy as an aspect of the Patent Clause. The right to copy is constitutionally protected and is absolutely essential to the successful long-term operation of a free and competitive economy. I therefore respectfully dissent.

---

6. The *"Mark Twain"* case clearly espouses a policy that materials not protected by copyright are available to the public and cannot be protected by trademark. The court noted that an author could obtain an injunction if a publisher attributed to him a work that he had never written. 14 F. at 730–31. However, the court flatly rejected as a matter of policy any trademark interest Clemens sought to assert in the name "Mark Twain."

The invention of a nom de plume gives the writer no increase of right over another who
uses his own name. Trade-marks are the means by which manufacturers of vendible merchandise designate or state to the public the quality of such goods, and the fact that they are the manufacturers of them ... but an author cannot, by adoption of a nom de plume, be allowed to defeat the well-settled rules of the common law in force in this country, that the 'publication of a literary work without copyright is a dedication to the public, after which any one may republish it.'
*Id.* at 731–32.